UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
TRACY ELIZABETH HILL OGLETREE,

                         Plaintiff,

         -against-

ANDREW M. SAUL,
Commissioner of Social Security,

                      Defendant.
-------------------------------------------------------------X

**OPINION AND ORDER**

19 Civ. 7208 (JCM)

       Plaintiff Tracy Elizabeth Hill Ogletree ("Plaintiff") commenced this action pursuant to 42

U.S.C. § 405(g), challenging the decision of Defendant Andrew M. Saul, the Commissioner of

Social Security ("the Commissioner"), which denied Plaintiff's application for disability

insurance benefits, finding her not disabled within the meaning of the Social Security Act.

(Docket No. 1).  Presently before this Court are (1) Plaintiff's motion for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 15), and

(2) the Commissioner's cross-motion for judgment on the pleadings, (Docket No. 17).  For the

reasons set forth herein, the Commissioner's cross-motion is granted and Plaintiff's motion is

denied.

## I. BACKGROUND

       Plaintiff was born in 1965. (R.[1] 542).  She filed an application for disability insurance

benefits on February 4, 2016, alleging that she became disabled on July 24, 2015. (R. 544).

Plaintiff's application was initially denied on February 26, 2016, (R. 472), after which she

requested a hearing, (R. 490), which was held on January 24, 2018 before Administrative Law

Judge ("ALJ") Katherine D. Wisz, (R. 401-41).  ALJ Wisz issued a decision on July 24, 2018,

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social
security benefits, filed on November 21, 2019. (Docket Nos. 12-1 through 12-14).

denying Plaintiff's claim. (R. 9-20). Plaintiff requested review by the Appeals Council, which denied the request on June 5, 2019, (R. 1-4), making the ALJ's decision ripe for review.

## A. Medical Evidence Prior to the Relevant Period

On August 5, 2014, Plaintiff saw Dr. Asma Afzal at Knightdale Family Practice ("Knightdale") complaining, *inter alia*, of chest pain in the mid-sternal region and intermittent shortness of breath, but also indicated that the chest pain was not accompanied by shortness of breath, dizziness, nausea, sweating, or syncope. (R. 830). Plaintiff's pulmonary and cardiovascular functions were normal, Plaintiff's electrocardiogram ("EKG") demonstrated a normal sinus rhythm, and she presented with a normal mood and affect. (R. 831). Dr. Afzal diagnosed Plaintiff with general shortness of breath, chest pain, and heartburn, and opined that these diagnoses "may be secondary to GERD." (*Id.*). On September 10, 2014, Plaintiff saw Dr. Kavitha S. Kadumpalli at UNC Healthcare for a consultation concerning her shortness of breath and possible sarcoidosis. (R. 146). During a physical examination, Plaintiff's functioning was largely normal, with Plaintiff denying chest pain, palpitations, apnea, hemoptysis, as well as anxiety, depression and agitation. (R. 146-47). Dr. Kadumpalli diagnosed Plaintiff with reflux, shortness of breath and bronchiectasis. (R. 147). Plaintiff saw Dr. Kadumpalli again on November 12, 2014 for a consultation, which yielded similar results to the September 10, 2014 visit. (R. 152-55).

On April 1, 2015, Plaintiff presented at the UNC Emergency Department complaining of chest pain, dizziness, lightheadedness and disorientation. (R. 171, *repeated*, 685). Plaintiff explained that earlier in the day she had attempted to file a restraining order against a family member, a process she characterized as stressful and anxiety provoking. (R. 171, *repeated*, 685, 175, *repeated*, 689). Plaintiff was "markedly hypertensive," but had no history of hypertensive

cardiovascular disease, denied any history of coronary disease, and rated her discomfort at 4.5 out of 10. (R. 685). Plaintiff's EKG revealed sinus tachycardia, a right atrial enlargement, a T-wave abnormality, and a chest X-ray revealed mild chronic interstitial prominence – compatible with known sarcoidosis, but yielded no evidence of acute cardiopulmonary disease. (R. 174, *repeated*, 688). Given the risk factors evident from testing, Plaintiff was admitted to the hospital for "provocative stress testing." (R. 689). On April 2, 2015, Plaintiff underwent a stress echocardiogram, which was unremarkable, and she did not have any additional chest pain. (R. 161-63, *repeated*, 675-77). Plaintiff's symptoms were characterized as "secondary to recent stressors," and her discharge diagnoses included chest pain, dizziness, hypertensive urgency, anxiety, GERD and probable sarcoidosis. (R. 160-63, *repeated*, 674-76). Plaintiff went to the UNC Emergency Department a second time on June 30, 2015, again complaining of chest pain and shortness of breath. (R. 192, *repeated*, 718). Plaintiff explained that her symptoms began two days earlier, and consisted of some chest pain, gagging and choking followed by two episodes of vomiting. (*Id.*). The next day, her symptoms resolved somewhat, but the chest pain returned. (*Id.*). An EKG showed normal sinus rhythm, a non-specific T-wave, and "no new findings [or] signs of ischemia" when compared to the old EKG. (R. 195, *repeated*, 625). In addition, an X-ray of the chest revealed no interval changes from April 1, 2015 or active cardiopulmonary disease. (R. 196, *repeated*, 626). Dr. William Grant determined that Plaintiff's chest pain was likely caused by esophageal reflux, resulting in his increasing her antacid medication, and instructing Plaintiff to follow up with her primary care physician in two weeks. (R. 197, *repeated*, 627).

On July 7, 2015, Plaintiff saw Dr. Jennifer Benjamina Phifer at Knightdale for a medication refill. (R. 934). Dr. Phifer noted that Plaintiff had been seen recently for chest

discomfort and shortness of breath, and that Plaintiff was "not compliant with taking her [blood pressure] meds daily, and [was] not checking [blood pressure] at home." (*Id.*).  Plaintiff's pulmonary and cardiovascular functions were normal, and she presented with a normal mood and affect. (R. 935).  Dr. Phifer determined that Plaintiff had abnormal red blood cell indices, unspecified essential hypertension, as well as dermatitis, and recommended that she take her blood pressure medications daily. (R. 846, 936).

## B.  Medical Evidence During the Relevant Period

Plaintiff went to the UNC Emergency Department a third time on July 20, 2015 complaining of "heart racing and [a] possible anxiety attack." (R. 204, *repeated*, 635).  Plaintiff explained that she "had just drank a cup of coffee, and felt like her heart started racing, and she began to feel anxious, sweaty, [and] lightheaded." (*Id.*).  While Plaintiff denied experiencing chest pain, she did express having some chest discomfort and compared her symptoms to those she felt in April 2015 that precipitated her previous admission. (*Id.*).  Plaintiff explained that she had been under significant stress and that her symptoms worsened "when she th[ought] about the stress." (*Id.*).  An EKG revealed nonspecific sinus tachycardia abnormalities, which were not present in the June 30, 2015 EKG, right atrial enlargement, and her heart rate increased by 44 bpm. (R. 207, *repeated,* 638).  A chest X-ray revealed "[s]table chest with findings consistent with known pulmonary fibrosis," but "[n]o acute cardiopulmonary disease." (*Id.*).  Dr. Terrence Fleming determined that Plaintiff likely suffered an anxiety or caffeine-related episode of tachycardia, anxiety, and near syncope, and suggested that she avoid caffeine. (R. 208, *repeated*, 639).  Dr. Fleming prescribed Valium to use in the event of future anxiety attacks and instructed that she follow up with her primary care physician. (*Id.*).

On August 13, 2015, Plaintiff saw Nurse Practitioner ("NP") Jolena Beth Allred at Knightdale complaining primarily of anxiety and requesting Valium. (R. 862, *repeated*, 974). NP Allred noted that Plaintiff had a "long history of anxiety and panic disorder that has waxed and waned," and Plaintiff explained that her heart was beating fast and she was unable to focus, was irritable and scared, and believed her stress began after "she was told that she had some sort of lung issue/pulmonary fibrosis." (*Id.*). NP Allred diagnosed Plaintiff with anxiety and prescribed Lexapro and Klonopin. (R. 863, *repeated*, 975-76).

On September 5, 2015, Plaintiff went to the UNC Emergency Department complaining of anxiety. (R. 216, *repeated*, 653). Plaintiff explained that she attempted to take her medication to lower her elevated blood pressure, but it only caused her anxiety to ripen into a "full-blown anxiety attack." (*Id.*). Plaintiff indicated that "social and financial stressors at home" caused her anxiety, she denied chest and abdominal pain, and explained that her head felt "funny or fuzzy." (*Id.*). After an examination, Dr. Robert Brownstein determined that Plaintiff was experiencing another panic attack and treated her with Ativan, which Plaintiff reported made her feel much better. (R. 219, *repeated*, 656). Dr. Brownstein recommended that Plaintiff take the Lexapro that had been prescribed, take Klonopin as needed, and follow up with her primary care physician. (R. 219, *repeated*, 656). On September 10, 2015, Plaintiff saw Dr. Phifer to discuss anxiety that she had been experiencing. (R. 876, *repeated*, 993). Plaintiff explained that she experienced a racing heart and thoughts, was "feeling on edge," but denied being depressed. (*Id.*). During a physical examination, Plaintiff's heart rate and effort were normal, she had a regular rhythm, and her mood, affect, behavior, and judgment were all normal. (R. 877, *repeated*, 994). Dr. Phifer diagnosed Plaintiff with anxiety, increased Plaintiff's Lexapro dose to 20 mg, and referred her for a psychiatric evaluation. (R. 877-78, *repeated*, 995).

5

Plaintiff saw Dr. Phifer again on September 21, 2015 for a yearly physical examination where she informed Dr. Phifer that she had an appointment "with mental health this week," and admitted that she had missed "a day or so of HCTZ." (R. 899, *repeated*, 1025). Plaintiff's pulmonary and cardiovascular functions were normal, she had a normal mood and affect, and Dr. Phifer determined that Plaintiff had unspecified essential hypertension and should take HCTZ in the morning. (R. 901, *repeated*, 1027). On October 21, 2015, Plaintiff saw Dr. Kadumpalli for a consultation regarding her shortness of breath and possible sarcoidosis. (R. 224). Plaintiff indicated that her shortness of breath had improved, that she was trying to lose weight, and that she had anxiety, but was "on Lexapro which [was] helping her." (R. 224-25). Plaintiff saw Dr. Phifer again on December 21, 2015 complaining of hypertension and increased anxiety at night, as well as disturbing and vivid dreams associated with diaphoresis. (R. 913, *repeated*, 1044). Plaintiff's cardiovascular and pulmonary functions were normal, as well as her mood and affect, and Dr. Phifer determined that Plaintiff was experiencing unspecified essential hypertension and generalized anxiety disorder. (R. 914, *repeated*, R. 1045). Dr. Phifer further indicated that an appointment would be scheduled with behavioral health, and noted that Plaintiff was stable on her medications. (R. 915, *repeated*, 1046).

On January 15, 2016, Plaintiff presented at the UNC Emergency Department complaining of lightheadedness and fatigue, but denied chest pain, shortness of breath, headaches or focal weakness. (R. 231, *repeated*, 660). Plaintiff explained that her lightheadedness and palpitations caused her to develop anxiety, and that these symptoms had occurred before, but were heightened in the past week. (*Id.*). After an examination, Dr. Ryan Lamb determined that although Plaintiff was "having more stress and anxiety in general," she was "otherwise well-appearing." (R. 234, *repeated*, 663). He also noted that they should

6

consider "Holter monitoring" if Plaintiff's palpitations continued. (*Id.*).  On March 23, 2016,
Plaintiff again went to the UNC Emergency Department complaining of anxiety, which she
attributed, in part, to concerns with her family, relationships, finances and health, and neither
Xanax nor breathing exercises alleviated it. (R. 242).  She also expressed having elevated blood
pressure, fatigue, head pain and diarrhea. (*Id.*).  After an examination, Dr. Robert Denton
determined that Plaintiff had nonspecific headaches and muscle aches of unclear etiology, and
was experiencing an exacerbation of her anxiety, though she appeared calm and was in no acute
distress. (R. 246).  He recommended doubling her dose of Xanax "as needed for anxiety state,"
and discharged Plaintiff in stable condition. (*Id.*).

On May 20, 2016, Plaintiff saw Dr. Phifer due to a panic attack that she had earlier that
day and because of worsening anxiety. (R. 1063).  Plaintiff explained that she was experiencing
heart palpitations, diarrhea, sweating and trouble breathing. (*Id.*).  Plaintiff stated that she had
"decreased [her] dose of Lexapro" in an effort to "get off medication," but had taken a full dose
this morning and was able to drive to her appointment after calming down. (*Id.*).  A physical
examination revealed that Plaintiff's cardiovascular and pulmonary functions were normal, and
while her speech, judgment, thought content, cognition and memory were normal, she presented
with an anxious and depressed mood. (R. 1064).  Dr. Phifer diagnosed Plaintiff with generalized
anxiety disorder, paresthesia, anxiety and unspecified essential hypertension, continued to
prescribe Klonopin, and Lexapro, and referred Plaintiff for a mental health evaluation with
psychiatry. (R. 1064-65).  On July 19, 2016, Plaintiff saw Dr. Dustin Ryan Pierson at Knightdale
complaining of upper respiratory symptoms, including shortness of breath, nasal congestion,
cough and fatigue. (R. 1097).  A physical examination demonstrated that Plaintiff had normal
cardiovascular and pulmonary functions, with no respiratory distress or wheezing, and Dr.

Pierson determined that Plaintiff had shortness of breath, pulmonary fibrosis and allergic rhinitis due to pollen, and prescribed prednisone. (R. 1098-99).

On August 22, 2016, Plaintiff saw Dr. Phifer, complaining primarily of anxiety, as well as heart palpitations, which "occur[ed] randomly throughout the day," with associated dizziness. (R. 1114). Plaintiff stated that she had not been taking Lexapro for approximately four to six weeks, but began taking it again four days ago. (*Id.*). She was also having more crying spells, depressed moods, and "did not keep [her] app[ointment] with psychiatry." (*Id.*). Plaintiff's pulmonary and cardiovascular functions were largely normal, except her cardiovascular examination revealed "friction rub," but "no gallop." (R. 1115). While Plaintiff's speech, judgment, thought content, cognition and memory were normal, Dr. Phifer described her as "slowed," sad, and tearful during the examination. (*Id.*). Dr. Phifer diagnosed Plaintiff with generalized anxiety disorder likely with mild depression and counseled her on the importance of taking Lexapro daily as prescribed, and opined that her "[s]ymptoms may be up and down due to noncompliance, and most likely reason for heart flutter sensation." (R. 1116). Dr. Phifer recommended adding 1/2 Klonopin every morning until the Lexapro was in Plaintiff's system completely, and Plaintiff indicated that she would make an appointment with psychiatry. (*Id.*).

On September 22, 2016, Plaintiff saw Dr. Phifer for a yearly physical examination. (R. 1131). Plaintiff complained of heart fluttering precipitated by anxiety, and indicated that she was in counseling which was helping her anxiety, but was not taking Lexapro daily because it "makes her feel as if in a fog." (*Id.*). Plaintiff's cardiovascular and pulmonary functions were normal, she had a normal mood and affect, and Dr. Phifer diagnosed Plaintiff with heart palpitations and unspecified essential hypertension. (R. 1133). Dr. Phifer discussed the importance of proper

Lexapro usage with Plaintiff, and Plaintiff requested a referral to Rex Cardiology due to her palpitations, which Dr. Phifer attributed most likely to Plaintiff's anxiety. (R. 1134).

On October 10, 2016, Plaintiff saw Dr. Judy Ann-Marie Brangman at Knightdale after she had been admitted for observation five days earlier due to non-cardiac chest pain, palpitations, premature ventricular contractions ("PVCs") and hypertensive urgency. (R. 1165). Plaintiff reported elevated blood pressure, anxiety and social stressors, and occasional headaches, and Dr. Brangman diagnosed Plaintiff with essential hypertension and palpitations, and continued Plaintiff on Lexapro. (R. 1165, 1167). Plaintiff saw Dr. Brangman again on December 15, 2016, complaining primarily of a sore throat and sinus issues. (R. 1183). Dr. Brangman noted that Plaintiff's cardiology results following the October 10, 2016 visit showed PVCs and premature atrial contractions ("PACs"), and the physician from cardiology recommended that Plaintiff begin Tropol, but was not able to contact Plaintiff. (*Id.*). Plaintiff presented with normal respiratory effort that was clear to auscultation bilaterally, and her cardiovascular functions revealed no murmurs, rubs, or gallops, normal S1 and S2, and regular rate and rhythm ("RRR"). (R. 1185). Dr. Brangman determined that Plaintiff had PVCs, unspecified essential hypertension, generalized anxiety disorder, hyperlipidemia, an upper respiratory tract infection, palpitations, a cough, nasal congestion, and recommended that Plaintiff return in six months. (R. 1185-86).

On December 29, 2016, Plaintiff saw Dr. Phifer due to increased anxiety, nervousness, jitteriness and heart palpitations. (R. 1202). Plaintiff explained that she had used Klonopin three times since the symptoms began, and despite using Lexapro earlier that day, had not been taking it as prescribed. (*Id.*). Plaintiff explained that she did not want to take daily medication because "it makes her feel foggy in the brain," and had last seen a mental health counselor in October

2016, which "help[ed] [her] symptoms." (*Id.*).  During a physical examination, Dr. Phifer

observed Plaintiff "sleeping" on the examination table, but noted that her speech, behavior,

judgment, thought content, cognition and memory were normal, and she did not seem anxious.

(R. 1203).  Dr. Phifer diagnosed Plaintiff with generalized anxiety disorder, renewed her

Lexapro prescription, and stressed the "importance of taking med[ication] daily." (1203-04).  On

January 30, 2017, Plaintiff saw Dr. Pierson complaining of right-side chest pain that was

exacerbated by twisting and deep breathing, but alleviated by sitting. (R. 1218).  Plaintiff

complained of mild nausea, but denied vomiting, diarrhea, abdominal pain, shortness of breath,

changes in urination and sternal chest pain. (*Id.*).  Plaintiff's cardiovascular and pulmonary

functions were normal, but she had some tenderness on palpitation of the lower ribs. (R. 1219).

Dr. Pierson suspected costochondritis and prescribed Naxopren and Tramadrol for treatment. (R.

1220).

On February 13, 2017, Plaintiff saw Dr. Phifer because she was "jerking in her sleep."

(R. 1239).  Plaintiff explained that she did not want to take her Lexapro and blood pressure

medications during the night. (*Id.*).  Plaintiff's cardiovascular and pulmonary functions were

normal, as was her speech and behavior, and Dr. Phifer noted that Plaintiff did "not appear[]

acutely anxious." (R. 1240-41).  Dr. Phifer determined that Plaintiff was experiencing hypnic

jerks, generalized anxiety disorder and snoring, and recommended that Plaintiff continue taking

Lexapro daily, consider adding melatonin, and follow up with psychiatry to "resume

counseling." (R. 1241).  Plaintiff saw Dr. Phifer again on June 1, 2017 complaining of

hypertension. (R. 1254, *repeated*, 1314).  Plaintiff explained that her blood pressure was well

controlled at home and she did not have any cardiac symptoms. (*Id.*).  However, Plaintiff

indicated that her anxiety symptoms were "worsening" despite taking Lexapro daily, although

she acknowledged not scheduling a follow-up appointment with her counselor. (*Id.*).  Plaintiff's physical examination revealed normal functioning, and Dr. Phifer diagnosed Plaintiff with generalized anxiety disorder, unspecified essential hypertension, dyslipidemia, and PVCs and prescribed Plaintiff Effexor. (R. 1256-57, *repeated*, 1315-16).

On November 2, 2017, Plaintiff saw Dr. Phifer for a follow-up visit concerning hypertension. (R. 1318).  Plaintiff explained that she had been compliant with her anxiety medications, and had been "coping better," although she had good and bad days. (*Id.*).  Plaintiff's physical examination revealed normal functioning with Plaintiff's hypertension appearing "controlled," but Plaintiff continued to present with generalized anxiety disorder, and Dr. Phifer continued to prescribe Lexapro. (R. 1319-20).  Plaintiff was "very upset and crying" when she saw Dr. Phifer on December 6, 2017 for a wellness visit. (R. 1322).  Plaintiff explained that she had been experiencing "crying spells for the past 2 days," but could not identify the cause because there were no new adverse events or stressors, and her anxiety levels remained the same. (*Id.*).  However, Plaintiff reported that she had started a new job and was working five days a week from 2-7 p.m. and was no longer seeing a counselor because she was unable to afford it. (*Id.*).  Plaintiff's physical examination revealed normal functioning, but Dr. Phifer determined that Plaintiff was having mood changes and her generalized anxiety disorder was worsening. (R. 1325-26).  Consequently, Dr. Phifer suggested replacing Lexapro with Paroxetine, which Plaintiff was amenable to trying. (*Id.*).

On May 24, 2018, Plaintiff went to the UNC Emergency Department "complaining of a near syncopal event" where she became light headed after working for approximately 3.5 hours and felt like she was going to pass out. (R. 267).  In an effort to alleviate her symptoms, Plaintiff explained that she went to sit in the bathroom and removed her clothes because she was

diaphoretic. (*Id.*). Someone heard her in distress and facilitated bringing her by wheelchair to her medication. (*Id.*). Plaintiff took two Clonazepam tablets, four aspirin, and her hypertension medication. (*Id.*). Plaintiff explained that her work as a "cabin service agent" was "strenuous," and that she chose not to travel to the Emergency Department "via EMS because … her 'anxiety kicks in' when she is in an ambulance." (*Id.*).

After an examination, Dr. David Robert Messerly summarized that Plaintiff's physical examination, EKG, and labs were "unremarkable," and that he did not believe Plaintiff's symptoms represented a cardiac dysrhythmia, as Plaintiff had no chest pain, shortness of breath or palpitations, and her history suggested "some type of nonserious cause of dizziness and lightheadness, such as dehydration or over heating." (R. 271). Dr. Messerly gave Plaintiff a note for a few days off of work, but he did not believe there was evidence of any life threatening or time sensitive conditions. (*Id.*).

## C.  State Examiners

### 1.  Lori J. Downing, Psy.D. – Consultative Psychologist

On February 24, 2016, Plaintiff saw Dr. Lori J. Downing for a consultative psychological examination. (R. 930-33). Plaintiff reported that she had been diagnosed with high blood pressure, pulmonary fibrosis and depression by her "primary care physician within the last few years." (R. 930). Plaintiff explained that she experienced sad moods, crying spells, reduced energy and motivation, increased irritability, isolation and withdrawal, but never thought about harming herself. (*Id.*). Plaintiff also explained that she had anxiety, which often manifested itself in the morning, lasted "about 2 hours at a time," and involved "feelings of fear and nervousness," along with "increased heart rate, palpitations and GI distress." (*Id.*). Plaintiff reported that she saw a psychiatrist "a few times in 2012," and had been prescribed Lexapro and Clonazepam by

her general practitioner, both of which she claimed had been "somewhat helpful." (*Id.*). Plaintiff's daily activities included attending to her personal hygiene, chores around the house, going to the grocery store occasionally, and Plaintiff indicated that she was able to "manage her own paperwork, appointments, and obligations," as well as her medications. (R. 931).

During a mental status examination, Plaintiff was "pleasant and easily engaged," with no abnormalities or remarkable features noted with her speech, thought process or content, she "displayed a wide range of affect," and did not report any perceptual disturbances. (R. 931). Plaintiff fell within the "low average range of intellectual functioning" and Dr. Downing determined that while she displayed good judgment, she had "below average . . . insight into her mental health." (R. 931-32).  Dr. Downing diagnosed Plaintiff with major depressive disorder – recurrent, moderate – and anxiety disorder not otherwise specified, concluded she would be able to manage her own benefits, and provided the following summary:

> [Plaintiff] is able to understand, retain and follow instructions. Moreover, she is able to sustain the attention needed to perform simple and repetitive tasks.  The [Plaintiff] has the ability to relate to others, including peers and customers, in an effective and appropriate manner.  She is also able to relate effectively to supervisors.  Finally, the [Plaintiff] has a decreased ability to tolerate stress and pressure and therefore would function best in a low stress environment.

(R. 932).

**2.  Darolyn Hilts, Ph.D.**

On February 25, 2016, Dr. Darolyn Hilts reviewed Plaintiff's medical records and the consultative examination conducted by Dr. Downing, and found Plaintiff's allegations "partially credible." (R. 453).  Dr. Hilts gave "great weight" to Dr. Downing's opinion, writing that while Plaintiff had "difficulties with anxiety and mood that would be expected to result in some limitations" they were "not so severe to preclude all work." (*Id.*).  Dr. Hilts assessed that Plaintiff

would be "moderately limited" in carrying out detailed instructions, maintaining attention and concentration for extended periods of time, making simple work-related decisions, interacting with the public, and responding to changes in the work setting, but would "not [be] significantly limited" in carrying out simple instructions, maintaining a regular work schedule, working in close proximity to others without distraction, responding to simple instructions, getting along with peers, travelling to unfamiliar places, and setting realistic goals. (R. 451-52).

### 3. April L. Strobel-Nuss, Psy.D.

On March 17, 2016, Dr. Strobel-Nuss conducted a second review of Plaintiff's medical record, finding that Plaintiff did not "allege new or worsening of impairment" or "report any new or additional treatment," and recommending that the initial report be adopted as written. (R. 462). Dr. Strobel-Nuss similarly found Plaintiff's allegations "partially credible," and found Dr. Downing's consultative report "consistent with all the evidence in the file." (*Id.*). Dr. Strobel-Nuss determined that Plaintiff was "not significantly limited" in sustaining an ordinary routine, following simple work-related directions, performing activities consistent with a work schedule, and making simple work-related decisions, but was "moderately limited" in social interactions, maintaining attention and concentration, and in responding to changing work settings. (R. 465-67).

### D. Plaintiff's Testimony

Plaintiff appeared *pro se* at the December 15, 2017 hearing. (R. 401-04). Plaintiff testified that she resides with her husband, who works, and has two adult children and two grandchildren. (R. 413-14). Plaintiff graduated from high school and has an Associate's Degree in the area of surgical technology from Miller Motte College. (R. 415). Plaintiff testified that she

was previously certified as a surgical technologist, but that her certification expired on July 3, 2016. (R. 416).

In 2015, Plaintiff worked as a customer service clerk for the City of Raleigh, where her primary duties included greeting people at the reception desk and directing them to the appropriate person. (R. 416-17).  In this role, Plaintiff sat the majority of the time, was not required to engage in any heavy lifting, and did not supervise any other individuals. (R. 417).  In and around 2011, Plaintiff worked as a surgical technologist for the New York City Health & Hospitals Corporation. (R. 417-18).  Her duties entailed assisting the surgeons in the operating room and preparing equipment, which included lifting upwards of 30 pounds. (R. 418).  In 2009, Plaintiff worked at WakeMed as a nurse's aide, emergency room technician, and surgical technician for approximately three to four years, where her duties centered on administering patient care, but did not require her to supervise anyone. (R. 418-19).  Plaintiff testified that her duties as a nurse's aide and emergency room technician were similar, but she took blood as an emergency room technician and it included more "emergency care . . . in every sense of the word," including administering first aid. (R. 423-24).

From approximately 1999 to 2005, Plaintiff worked for the American Kennel Club, first as a customer service representative and eventually as a compliance representative. (R. 419-21). Plaintiff engaged in "office work . . . customer service and planning" while at the American Kennel Club and testified that her work as a compliance representative included drafting letters, speaking with customers, and was focused on policies and regulations pertaining to dog pedigrees. (R. 421).  This role did not involve any heavy lifting, but did involve Plaintiff supervising six individuals. (R. 421-22).  Plaintiff was also a full-time event planner at the

American Kennel Club, which included planning "dog events," but she was unable to recall the years she held that position. (R. 422-23).

Plaintiff testified that up until April 2017, she worked three days a week for the City of Raleigh, earning $8,000 in 2016. (R. 425). Plaintiff indicated that she had two part-time jobs in 2017; she said she stopped working because her employer "didn't have any more work for [her]," and that she was unable to work more than part-time because of her anxiety and depression. (R. 425-26). Plaintiff testified that she had been working four days a week from 2:00 to 7:00 for the last month at a cleaning job at the airport. (R. 433-34). Plaintiff explained that "every morning . . . [she] get[s] really nervous and panicky," experiences these symptoms in the middle of the day, and frequently wakes up in the middle of the night with her heart racing. (R. 426). Plaintiff testified that her doctor has "tried [her] on three different kinds of medicine," and she takes medicine in the morning that "helps" somewhat with her symptoms. (R. 426). Plaintiff was not seeing a mental health provider because she was unable to afford the copay and because "sitting down and talking" is "a lot to deal with." (R. 427). Plaintiff indicated that she cries frequently and believed her anxiety and depression might stem from her marriage and "going through things with [her] kids." (R. 427-28).

Plaintiff testified that her limitations were primarily mental, not physical, although she was limited at times by arthritis in her knees. (R. 428-29). Plaintiff recently got a dog, which she testified is helping her anxiety, and she also takes Epsom salt baths for both her arthritis and anxiety. (R. 428-29). Plaintiff testified that she tries to get six to seven hours of sleep each night, but often only gets two-and-a-half hours of uninterrupted sleep. (R. 430-31). Plaintiff explained that she is often awoken by "very vivid" dreams and an elevated heart rate. (R. 431). Plaintiff testified that she plans her days around "dealing with [her] anxiety," which includes feeding her

cat, going for "at least a 30-minute walk," and then taking her blood pressure medication

followed by her anxiety medication approximately an hour later. (R. 432).  Plaintiff testified that

she "tr[ies] to rest as much as [she] can and just not think so much" and to "keep busy around the

house." (*Id.*).  Plaintiff testified that she cooks approximately three times a week, but they also

eat fast food for the most part, and occasionally she goes to the grocery store. (R. 432-33).

Plaintiff explained that she "do[es] [not] sleep with her husband anymore because . . . that's

stressful . . . dealing with him," and she tries to remove as much stress as she can. (R. 433).

**E.  The Vocational Expert's Testimony**

Vocational Expert ("VE") Jessica Conard first testified about Plaintiff's past relevant

work, indicating that Plaintiff's work at the American Kennel Club was equivalent to the DOT

title of "administrative assistant," which qualifies as sedentary work, and Plaintiff's work as a

surgical technician was classified by the DOT as light work, but performed by Plaintiff at a

medium level. (R. 437).  VE Conard determined that Plaintiff's role as an emergency medical

technician constituted a composite job, as it included tasks encompassed in the DOT titles of

emergency medical technician and certified nurse, and was performed by Plaintiff at a medium

exertion level. (*Id.*).  VE Conard also determined that Plaintiff performed past relevant work as a

receptionist at a sedentary level. (R. 437-38).

The ALJ posed a hypothetical to the VE, asking her to assume an individual of Plaintiff's

age and education, who had the following limitations: the individual: (1) performed light work;

(2) had occasional exposure to hazards; (3) could understand, retain, and follow simple

instructions, and was capable of sustaining attention for simple tasks; and (4) had occasional

"superficial" interaction with the public, without any production pace or quotas, with work being

"introduced gradually." (R. 438).  The VE determined that such an individual could not perform

Plaintiff's past relevant work, but would be capable of performing work as a laundry folder, hand packager and hospital products assembler. (R. 438-39).  The ALJ also asked the VE to assume the same hypothetical individual, except the individual would be off task 15 percent of the time. (R. 439).  The VE responded that such a "limitation would be work-preclusive." (*Id.*).

**F.  The ALJ's Decision**

ALJ Wisz applied the five-step procedure established by the Commissioner for evaluating disability claims in her July 24, 2018 decision. *See* 20 C.F.R. § 404.1520(a).  At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the relevant period. (R. 12).  At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative joint disease, anxiety and depression. (*Id.*).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12-14).

The ALJ assessed that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b), with limitations outlined as follows:

> [S]he is limited to occasional exposure to hazards.  She is able to understand, retain, and follow simple instructions, and sustain attention for simple tasks.  The [Plaintiff] is limited to occasional, superficial interaction with the public.  She is limited to no production pace or quotas and work changes need to be introduced gradually.

(R. 14).  In arriving at the RFC, the ALJ determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (R. 16).  In evaluating the medical opinions, the ALJ assigned "great weight" to Dr. Downing's

opinion that Plaintiff "would function best within a low stress environment," but "less weight" to

the portion concerning Plaintiff's social limitations. (R. 17).  The ALJ also assigned "little

weight" to the portions of Dr. Strobel-Nuss' and Dr. Hilts' opinions that "use[d] the older 'B'

criteria standards for evaluating the [Plaintiff's] mental impairments," and "less weight" to the

"social restriction to interaction with the public," but "great weight" to other restrictions set forth

therein. (R. 17-18).  At step four, the ALJ found that Plaintiff was not able to perform her past

relevant work, but could perform work as a laundry worker, hand packager and hospital products

assembler. (R. 18-19).  Accordingly, the ALJ determined that Plaintiff was "not disabled" under

the relevant framework. (R. 19-20).

## II.  DISCUSSION

Plaintiff contends that the ALJ erred by: (1) failing to develop the record, not seeking

opinions from Plaintiff's treating physicians, and relying too heavily on the non-treating source

opinions; and (2) not properly evaluating Plaintiff's testimony and credibility. (Docket No. 16 at

10-21[2]).  The Commissioner contends that the ALJ's decision should be affirmed because she

fulfilled her duty to develop the record and the decision was supported by substantial evidence.

(Docket No. 18 at 17-30).

## A.  Legal Standards

A claimant is disabled if she "is unable 'to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C.

§ 423(d)(1)(A)).  The Social Security Administration ("SSA") has enacted a five-step sequential

analysis to determine if a claimant is eligible for benefits based on a disability:

---

[2] All page numbers refer to the page numbers assigned upon electronic filing.

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her
> past relevant work despite the impairment; and (5) whether there
> are significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v).

   The claimant has the general burden of proving that he or she is statutorily disabled "and

bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176

(quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to

show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 445 (2d Cir. 2012).

**B.  Standard of Review**

   When reviewing an appeal from a denial of disability insurance benefits, the court's

review is "limited to determining whether the SSA's conclusions were supported by substantial

evidence in the record and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d

409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also*

42 U.S.C. § 405(g).  The Court does not substitute its judgment for the Commissioner's, "or

determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d

118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d

Cir. 1998)).  However, where the proper legal standards have not been applied and "might have

affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty

to review the decision of the administrative agency by simply deferring to the factual findings of

the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*  "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C.  The ALJ's Duty to Develop the Record

Plaintiff argues that the ALJ failed to develop the record because she failed to obtain missing records from Knightdale and Carolina Mental Health Services, or request any medical source statements. (Docket No. 16 at 12).  Plaintiff also argues that the ALJ failed to request or obtain medical source statements from any of Plaintiff's treating physicians, resulting in her relying too heavily on state examiners' opinions. (*Id.* at 12-15).  The Commissioner argues that the ALJ fulfilled her duty to develop the record, was not obligated to obtain any further opinion statements, and properly relied on the non-treating source opinions. (Docket No. 18 at 18-22). The Court agrees with the Commissioner.

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, an ALJ, unlike a judge in a trial, has an affirmative duty to develop the record on behalf of all claimants. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).  The ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111.  The applicable SSA regulations provide, in relevant part, "we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months

before you filed your application." 20 C.F.R. § 416.912(d); *see also* 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i).  Where, as here, a claimant "waives h[er] right to counsel and proceeds *pro se* . . . [t]he ALJ must adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered and by scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts." *Moran*, 569 F.3d at 113 (internal quotations and citations omitted)(alterations in original).  Furthermore, "[t]he obligation to develop the record is enhanced when the disability in question is a psychiatric impairment." *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 215 (S.D.N.Y. 2017) (internal quotation marks omitted).  Thus, where a claimant is *pro se* and alleging mental impairments, courts have concluded that the ALJ bears a "doubly heightened" duty to develop the record. *Estrella v. Berryhill*, No. 15 CV 6966 (CS)(LMS), 2017 WL 2693722, at *21 (S.D.N.Y. June 22, 2017) (citing *Corporan v. Comm'r of Soc. Sec.*, No. 12-Civ-6704 (JPO)(SN), 2015 WL 321832, at *6 n.7 (S.D.N.Y. Jan. 23, 2015)).

"However, the duty to develop the record is 'not absolute,' and requires 'the ALJ only to ensure that the record contains sufficient evidence to make a determination.'" *Johnson v. Comm'r of Soc. Sec.*, No. 17 Civ. 5598 (BCM), 2018 WL 3650162, at *13 (S.D.N.Y. July 31, 2018) (quoting *Bussi v. Barnhart*, No. 01 Civ. 4330 (GEL), 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003)).  A court may uphold an ALJ's determination where the record is "adequate to permit an informed finding." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses 'a complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (citation omitted). "'The duty to develop the record goes hand in hand with the treating physician rule, which

requires the ALJ to give special deference to the opinion of a claimant's treating physician.'"
*Paredes v. Comm'r of Soc. Sec.*, 16 Civ. 00810 (BCM), 2017 WL 2210865, at *17 (S.D.N.Y.
May 19, 2017) (quoting *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004)).  "An
ALJ cannot, of course, pay deference to the opinion of the claimant's treating physician if no
such opinion is in the record." *Id.*  Consequently, an ALJ must "make every reasonable effort to
obtain not merely the medical records of the treating physician but also a report that sets forth the
opinion of [ ] that treating physician as to the existence, the nature, and the severity of the
claimed disability." *Rivera v. Comm'r of Soc. Sec.*, No. 14 Civ. 6567 (KPF), 2015 WL 6619367,
at *11 (S.D.N.Y. Oct. 30, 2015).  However, "remand is not always required when an ALJ fails in
his duty to request opinions, particularly where [ ] the record contains sufficient evidence from
which an ALJ can assess the petitioner's residual functional capacity." *Tankisi*, 521 F. App'x at
34.  Indeed, "courts in this District have found that 'it is not *per se* error for an ALJ to make a
disability determination without having sought the opinion of the claimant's treating physician.'"
*Rivera*, 2015 WL 6619367, at *11 (quoting *Sanchez v. Colvin*, No. 13 Civ. 6303 (PAE), 2015
WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015)).

Plaintiff first argues that the ALJ erred by not obtaining records from Knightdale and
Carolina Mental Health Services. (Docket No. 16 at 12-14).  20 C.F.R. § 404.1512(b)(i) requires
that the ALJ make "[e]very reasonable effort" to obtain medical records, which is defined as an
initial request and "one follow-up request to obtain the medical evidence." *See also* 20 C.F.R. §
416.912(d)(1).  At the beginning of the hearing, Plaintiff notified the ALJ that medical records
were missing from Pankaj Parikh, a cardiologist she saw at Knightdale in June 2017, and from a
psychologist she had seen at Carolina Mental Health Services. (R. 408-10).  At the conclusion of
the hearing, the ALJ informed Plaintiff that she would leave the record open in an effort to obtain

the additional records referenced by Plaintiff. (R. 440).  The ALJ also told Plaintiff that she

should "look up the address for [her] psychologist" and "send that back to [the ALJ] in a prepaid

envelope so that we can request those records." (*Id.*).

Thereafter, between December 2017 and March 12, 2018, the ALJ made three requests

and two phone calls in an effort to obtain Dr. Parikh's records to no avail. (R. 1333).  With

respect to the Carolina Mental Health Services records, the ALJ mailed a records request to

them; called the facility to check on the status of the initial request; subsequently sent two

additional requests; and called once more at which point, she spoke with an individual who

confirmed that Plaintiff was last seen on October 6, 2016, but that there were no records to send.

(R. 1332).  The ALJ's efforts to obtain records from Carolina Mental Health Services and

Plaintiff's cardiologist were inherently reasonable and complied with the requirement to make

"every reasonable effort." *See Cruz v. Astrue*, 941 F. Supp. 2d 483, 495–96 (S.D.N.Y. 2013)

(which held that the ALJ fulfilled his duty to develop the record where he contacted plaintiff's

treating physician twice and the physician "never responded to [the second request]," noting that

"[t]he ALJ's efforts not only followed the regulations but were inherently reasonable"); *see also

Martinez-Paulino v. Astrue*, No. 11 Civ. 5485 (RPP), 2012 WL 3564140, at *14 (S.D.N.Y. Aug.

20, 2012) (rejecting plaintiff's argument that the ALJ did not satisfy his duty to develop the

record when he made seven attempts to obtain mental health records, left the record open after

the hearing, and ordered a consultative examination because the psychiatric treating records were

unavailable.).  Thus, the ALJ fulfilled her duty to develop the record.

Plaintiff also argues that the ALJ erred by failing to obtain an opinion statement from

Plaintiff's treating physicians and instead relied on the opinion of a consultative examiner.

(Docket No. 16 at 14-15).  However, "[a]n appropriate consultative report, combined with other

evidence in the record, can provide substantial evidence for an ALJ's RFC determination and disability decision notwithstanding a lack of medical reports from treating physicians." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 644 (S.D.N.Y. 2019).  Here, the record demonstrates that the ALJ requested, and received, hundreds of pages of medical records detailing treatment Plaintiff received at Knightdale from Dr. Phifer for anxiety and depression. (R. 876-77, 899-901, 913-14, 1063-64, 1114-16, 1131-34, 1202-04, 1239-41, 1254-59, 1318-26).  Dr. Phifer's notes provide substantial evidence and insight into Plaintiff's anxiety, stress, and occasional depression, as well as the treatment rendered, both prior to and during the relevant period, thus affording the ALJ a comprehensive history of Plaintiff's symptoms and medication regimen.  In addition to Dr. Phifer's records, the ALJ also received records from NP Jolena Beth Allred, who addressed Plaintiff's anxiety and panic disorders by prescribing Lexapro and Klonopin, (R. 862-63), as well as records from the UNC Emergency Department from 2015 through 2018 which shed some light on the causes of Plaintiff's stress, anxiety and panic attacks, (R. 161-63, 171-75, 204-08, 216-19, 231-34, 242-46, 267-71).  The ALJ also had Dr. Downing's opinion, which was consistent with significant portions of Dr. Phifer's medical notes. (R. 17).  Specifically, the ALJ determined that Dr. Downing's opinion that Plaintiff had a "decreased ability to tolerate stress and pressure, and that she would function best within a low stress environment" aligned with Dr. Phifer's notes, which, in relevant part, document Plaintiff's panic attacks, anxiety and depressed mood, but also frequently indicated normal cognition, judgment and thought content. (*Compare* R. 17 *with* R. 876-77, 899-901, 913-14, 1063-64, 1114-16, 1131-34, 1202-04, 1239-41, 1254-59, 1318-26.  Moreover, the ALJ also noted that Dr. Downing's conclusion that Plaintiff was capable of "relat[ing] to others, including peers and customers, in an effective and appropriate manner" was inconsistent with Plaintiff's presentation during her visits with Dr. Phifer, as well

as at the UNC Emergency Department and with NP Allred, and appropriately accounted for this in her RFC determination, which limited Plaintiff to "occasional, superficial interaction with the public." (R. 14, 17).  Thus, the objective medical evidence, combined with the consultative examiner's opinion, provided the ALJ with a detailed summary of Plaintiff's treatment and diagnoses, leaving no discernible gap in the record or basis to remand on the ground that the ALJ failed to obtain an opinion statement. *See, e.g.*, *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) ("Under these circumstances—especially considering that the ALJ also had all of the treatment notes from [plaintiff's] treating physicians—we do not think that the ALJ had any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians"); *Peterson v. Berryhill*, 17-CV-6397-JWF, 2018 WL 4232896, at \*4 (W.D.N.Y. Sept. 5, 2018) (finding that the ALJ fulfilled his duty to develop the record where the record contained effective summaries of plaintiff's treatment history, medication, estimated mental status and diagnoses); *see also Tankisi*, 521 F. App'x at 34 (summary order) ("Given the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity.").

Relatedly, Plaintiff's argument that the ALJ erred as a matter of law by not obtaining an opinion from one of Plaintiff's treating physician's is unavailing. (Docket No. 16 at 12, 14-15). Plaintiff relies heavily on *Peed v. Sullivan*, 778 F. Supp. 1241 (E.D.N.Y. 1991), in making this argument. (*Id.*).  "However . . . *Peed* should not be given weight, as [it] w[as] decided when the regulations explicitly required the ALJ to recontact a treating physician in light of an incomplete record." *Dougherty-Noteboom v. Berryhill*, 17-CV-00243-HBS, 2018 WL 3866671, at \*10

26

(W.D.N.Y. Aug. 15, 2018) (citations omitted).  20 C.F.R. § 404.1520(b)(2) affords ALJs wide

latitude in determining how best to supplement the record when they determine it is insufficient

or inconsistent, which includes recontacting the treating source, requesting additional evidence,

or asking the claimant to undergo a consultative examination.  Notably, the regulation explicitly

directs that the ALJ "might not take all of [those] actions," and that the "action(s) . . . take[n] will

depend on the nature of the inconsistency or insufficiency." 20 C.F.R. § 404.1520(b)(2).  As

discussed, the record demonstrates that the ALJ had at her disposal a trove of longitudinal

medical evidence from Dr. Phifer and the UNC Emergency Department, and opted to send

Plaintiff for a consultative examination conducted by Dr. Downing to obtain a medical source

statement.  The ALJ then appropriately assessed the consistency of Dr. Downing's opinion with

the objective medical evidence, explicitly noting both areas of consistency and inconsistency,

and taking those into account when arriving at the RFC. (R. 14-17); *see also Cardoza v. Comm'r

of Soc. Sec.*, 353 F. Supp. 3d 267, 283 (S.D.N.Y. 2019) ("When weighing the opinion of a non-

treating source, the ALJ must consider how closely the opinion aligns with the objective medical

record evidence, which is similar to its evaluation of a treating source.").

　　　　In addition to Dr. Downing's opinion, the ALJ also considered the opinions of the non-

examining consultative psychologists, who reviewed Plaintiff's medical file. (R. 17-18).  The

ALJ similarly assigned "great weight" to their conclusions that Plaintiff could understand and

retain simple instructions, maintain attention, and had mild difficulties in her activities of daily

living, but "less weight" to their opinions that Plaintiff could interact well with the public and co-

workers, which she found inconsistent with the record evidence, namely Plaintiff's "presentation

at times" during visits with Dr. Phifer. (R. 18, 1063, 1114, 1202-04, 1255-57).  Based on the

ALJ's proper consideration of these non-treating opinions, which included an appropriate

consideration of their consistency with Dr. Phifer's medical notes as well as Dr. Downing's opinion, the Court cannot conclude that the ALJ's reliance was in error. *See Piatt v. Colvin*, 80 F. Supp. 3d 480, 495 (W.D.N.Y. 2015) (finding no error where the ALJ relied on a non-examining physician's opinion that was "supported by . . . ample medical evidence"); *see also Leach ex rel. Murray v. Barnhart*, No. 02 Civ. 3561 RWS, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) (finding that a state agency opinion may constitute substantial evidence where it was "consistent with the record as a whole"); *see also Scuttles v. Colvin*, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (which held that the ALJ did not err in assigning the consultative examiner's opinion great weight where it was consistent with other record evidence).  Furthermore, given the lack of any obvious gaps in Plaintiff's treatment history, along with the opinions obtained from the state examiner, this Court does not believe that the ALJ "had any further obligation to supplement the record" with additional statements from any of Plaintiff's physicians. *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order); *see also Vanterpool v. Colvin*, No. 12-CV-8789 (VEC)(SN), 2014 WL 1979925, at *16 (S.D.N.Y. May 15, 2014) ("Nonetheless, 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim'") (quoting *Rosa*, 168 F.3d at 79 n.5).

Accordingly, the Court finds that the ALJ did not violate her duty to develop the record or err by not obtaining an opinion statement from Plaintiff's treating physician.

## D.  The ALJ's Credibility Determination

Plaintiff argues that the ALJ erred in evaluating Plaintiff's credibility by mischaracterizing the mental status examination findings in the record, discounting Plaintiff's alleged disability because she was able to perform some activities of daily living, and

inappropriately relying on Plaintiff's non-compliance with her medication regimen. (Docket No. 16 at 15-20).  The Commissioner argues that the ALJ's credibility determination was based on substantial evidence. (Docket No. 18 at 22-30).

The SSA's regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations.  First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  Second, if the claimant does suffer from an impairment, "the ALJ must consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (internal quotations and citation omitted).  The ALJ considers the claimant's activities, the location, duration, frequency and intensity of the pain or other symptoms, precipitating and aggravating factors, medication and other treatment, measures taken by the claimant to relieve pain or other symptoms, and other relevant factors. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2019).  After considering these factors, the ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment . . . regarding the true extent of the pain alleged by [plaintiff]." *Martinez v. Astrue*, No. 10 CIV. 9284 (PKC), 2012 WL 4761541, at *11 (S.D.N.Y. Aug. 1, 2012) (quoting *Minims v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)); *see also Genier*, 606 F.3d at 49 (the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.").  "If these findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount plaintiff's subjective complaints of pain." *Martinez*, 2012 WL 4761541, at *11 (citing *Aponte v. Sec'y of Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  "In addition, 'courts must show special deference to an ALJ's credibility

determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying.'" *Mayor v. Colvin*, 15 Civ. 0344 (AJP), 2015 WL 9166119, at *19 (S.D.N.Y. Dec. 17, 2015) (quoting *Marquez v. Colvin*, No. 12 Civ. 6819 (PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013)).

The ALJ found "that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision." (R. 16). The ALJ then proceeded to evaluate the objective medical evidence, Plaintiff's testimony concerning her activities of daily living, as well as Plaintiff's treatment history. (R. 16-18). After reviewing the ALJ's credibility determination, the Court finds that it is based on substantial evidence and should not be disturbed.

The record demonstrates that the ALJ properly considered Plaintiff's activities of daily living and mental status examinations, the majority of which were unremarkable, in finding that Plaintiff's subjective complaints did not align with the objective evidence. (R. 15-16). The ALJ correctly referenced treatment notes, which often demonstrated that despite complaining of anxiety and stress, and occasional depressed mood, Plaintiff's mood, judgment, thought content, cognition and overall mental status were largely normal. (R. 16, 876-77, 899-01, 1064, 1114-15, 1131, 1202-03, 1239-41, 1255-56, 1318-19). The ALJ further noted that Plaintiff was able to care for her personal hygiene, attend to chores around the house, manage her own paperwork, appointments, obligations, (R. 16), and Plaintiff also testified that she works approximately 20 hours per week as a cleaner at an airport, (R. 433-34, 1322). Additionally, the ALJ properly concluded that Plaintiff's treatment was relatively conservative, and amounted largely to

medication management by Dr. Phifer. (R. 16).  The records support this conclusion, as the

evidence indicates that Plaintiff's symptoms were controlled or managed by medication

prescribed by Dr. Phifer. (R. 224-25, 914-15, 1064-65, 1114-16, 1254-56, 1325-26).  Thus,

because the ALJ's "analysis explained h[er] reasoning with sufficient specificity for the Court to

review, and there was substantial evidence in the record to support h[er] conclusions," the Court

finds no error. *Bueno v. Comm'r of Soc. Sec.*, 17-CV-1847 (VSB)(RWL), 2018 WL 5798583, at

*15 (S.D.N.Y. Aug. 20, 2018), *report and recommendation adopted*, 2018 WL 5791967

(S.D.N.Y. Nov. 5, 2018); *see also e.g.*, *Urena v. Comm'r of Soc. Sec.*, 379 F. Supp. 3d 271, 287–

88 (S.D.N.Y. 2019) (which held that the record supported the ALJ's conclusion that plaintiff's

treatment, as well as her ability to perform activities of daily living, were only indicative of

"moderate symptoms"); *McGovern v. Berryhill*, Case No. 15-CV-10057 (KMK)(PED), 2018 WL

1587154, at *4 (S.D.N.Y. Mar. 29, 2018) (finding ALJ's credibility determination supported by

substantial evidence where the record demonstrated that plaintiff engaged in daily activities

without significant restrictions, symptoms were controlled by medication, and also worked 20-

hours-per week at a light level job); *Kotkowicz v. Colvin*, No. 13-CV-6472-CJS, 2014 WL

3819213, at *9 (W.D.N.Y. Aug. 4, 2014) (rejecting plaintiff's argument that the ALJ erred in

evaluating her credibility where the mental status examinations "were generally unremarkable,

particularly with regard to plaintiff's cognitive abilities.").

Plaintiff also argues that it was error for the ALJ to consider noncompliance with her

medication regimen in assessing her credibility. (Docket No. 16 at 19-20).  An ALJ may properly

take into account a claimant's compliance, or non-compliance, when assessing her credibility.

*See* SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996).  However, the ALJ may not draw

negative inferences from the claimant's failure to adhere to a prescribed course of treatment

"without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.*  Here, the ALJ did not rely heavily on Plaintiff's periodic failure to take her medication in assessing credibility, but rather included it as a small part of the overall credibility determination. (R. 16).  During several visits with Dr. Phifer, Plaintiff indicated that she had either voluntarily decreased her Lexapro, or stopped taking it entirely, citing drowsiness and brain fog as the primary reasons. (R. 1063, 1114, 1131, 1202).  At other points, Plaintiff indicated that the medication was helping her cope with stressors and anxiety. (R. 224-25, 1318).  Moreover, the record – as cited by the ALJ – also indicates that notwithstanding Plaintiff's compliance, her medication was changed because Dr. Phifer determined that Lexapro was not alleviating Plaintiff's anxiety. (R. 16, 1325-26).

While the ALJ cited to Plaintiff's rationale for not taking Lexapro – because it "made her feel foggy in the brain" – the ALJ did not consider whether this constituted a legitimate basis[3] for Plaintiff's "period of non-compliance." (R. 16).  Thus, to the extent the ALJ relied on Plaintiff's periodic failure to take Lexapro in assessing her credibility, she erred by not explicitly accounting for Plaintiff's purported rationale for non-compliance. *See Kuchenmeister v. Berryhill*, 16 Civ. 7975 (HBP), 2018 WL 526547, at *19 (S.D.N.Y. Jan. 19, 2018) (finding that the ALJ erred "in considering plaintiff's inconsistent attendance of therapy sessions in determining plaintiff's credibility without further inquiry.").  Nevertheless, the error was harmless because the ALJ's credibility determination rested heavily on Plaintiff's daily activities and treatment as set forth in the objective medical record, not her noncompliance. *See, e.g.*, *Gonzalez v. Berryhill*, Civ. No. 3:17CV01385 (SALM), 2018 WL 3956495, at *5 (D. Conn.

---

[3] Noncompliance may be justified if, *inter alia*, the side effects of the medication are intolerable. *See* SSR 96-7p, 1996 WL 374186, at *7.

Aug. 17, 2018) (which found the ALJ's failure to consider the plaintiff's reason for non-compliance and lack of treatment harmless where it "was but one factor in the ALJ's overall credibility determination"); *Kuchenmeister*, 2018 WL 526547, at *19 (finding error harmless where the overall credibility determination was supported by substantial evidence "even if plaintiff's inconsistent attendance at therapy sessions is ignored"); *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 207 (N.D.N.Y. 2012) (which found the ALJ's failure to consider plaintiff's explanation for not seeking further mental health treatment harmless where it was "only part of the ALJ's credibility assessment.").

Based on the deferential standard of review this Court must apply in evaluating an ALJ's credibility determination, *see Selian*, 708 F.3d at 420, as well as the substantial evidence in the record supporting the ALJ's findings, the Court finds no reason to disturb the ALJ's credibility determination. *See Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) (summary order) ("We have no reason to second-guess the credibility finding in this case where the ALJ identified specific record-based reasons for h[er] ruling.").

## III.  CONCLUSION

For the foregoing reasons, the Commissioner's cross-motion is granted and the Plaintiff's motion is denied.  The Clerk of the Court is respectfully requested to terminate the pending motions (Docket Nos. 15 and 17) and close the case.

Dated:    June 15, 2020
          White Plains, New York

SO ORDERED:

JUDITH C. McCARTHY
United States Magistrate Judge

33